**LANDMAN CORSI BALLAINE & FORD P.C.**
One Gateway Center, 22nd Floor
Newark, New Jersey 07102-5388
(973) 623-2700
**Attorneys for Plaintiff National Railroad Passenger Corporation**
By:   Jerry A. Cuomo
       Mark S. Landman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TESMEC USA, INC.<br><br>Defendant. | Case No.<br><br><br><u>**COMPLAINT and JURY DEMAND**</u> |
|---|---|

National Railroad Passenger Corporation ("Amtrak") for its Complaint against Tesmec USA, Inc. ("Tesmec") alleges as follows:

## NATURE OF THE ACTION

1.      On July 1, 2019, a piece of equipment known as a Production Work Car ("the Work Car") designed and manufactured by Tesmec and sold by Tesmec to Amtrak, caught fire and burned during Amtrak's operations in Hamilton, NJ.  The fire was caused by, *inter alia*, Tesmec's defective design and manufacture of the Work Car, which caused it to be in an unreasonably dangerous condition on the date of the fire.

2.      Following the fire, Tesmec failed, despite Amtrak's requests and demand, to replace or repair the Work Car or to compensate Amtrak for its resulting monetary losses.

3.      Amtrak's claims against Tesmec herein are premised upon breach of warranty,

breach of contract, strict products liability and negligence.

## THE PARTIES

4. Amtrak is a corporation created by an Act of Congress, 49 U.S.C. § 24101 *et seq.*, with its principal place of business in the District of Columbia.

5. Tesmec is a Texas corporation with its principal place of business located at 12520 East FM 917, Alvarado, Texas 76009.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Amtrak was created by an Act of Congress, U.S.C. § 24101 *et seq.*, and more than one-half of its capital stock is owned by the United States. See 28 U.S.C. §1349; 49 U.S.C. § 24101 *et seq*.

7. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because:

    a. pursuant to 49 U.S.C. § 24301(b), "Amtrak is a citizen only of the District of Columbia in deciding original jurisdiction of the district courts of the United States in a civil action";

    b. Tesmec is incorporated in Texas and its principal place of business is in Texas; and

    c. the amount in controversy exceeds $75,000.

8. This Court has personal jurisdiction over Tesmec because it has engaged in, and continues to engage in, continuous and systematic activities within the District of Columbia.

9. This Court also has personal jurisdiction over Tesmec on the basis that Tesmec has minimum contacts with the District of Columbia because it has purposefully engaged in activities

within the District of Columbia and Amtrak's causes of action arise, at least in part, from those activities. Specifically:

    a.    Tesmec has contracted to provide goods and services to Amtrak (a citizen of the District of Columbia);

    b.    in said contract, Tesmec has consented to jurisdiction in the District of Columbia with respect to the resolution of disputes thereunder;

    c.    Tesmec has further agreed to the application of the law of the District of Columbia to such disputes; and

    d.    Tesmec's breaches of said contract have caused Amtrak to sustain damage, injury and losses which have occurred, in whole or in part, within the District of Columbia.

10.    Based upon the foregoing, the Court also has personal jurisdiction over Tesmec, pursuant to the District of Columbia's long arm statute, D.C. Code § 13–423(a)(1-4).

11.    Venue is proper in this District because

    a.    Tesmec is subject to personal jurisdiction in this District and, therefore, is deemed to be a resident of this District for purposes of venue. 28 U.S.C. § 1391(b)(1); 28 U.S.C. § 1391(c)(2);

    b.    a substantial part of the events or omissions giving rise to Amtrak's claims occurred in this District. 28 U.S.C. § 1391(b)(2); and

    c.    Tesmec has contractually consented to resolve disputes which are the subject of this action in this Court.

**FACTUAL BACKGROUND**

A.  **Businesses of the Parties**

12.  Tesmec markets itself on its website as a company engaged in the design, manufacture and sale of "products, technologies and integrated solutions for the construction, maintenance and efficiency of infrastructures related to the transport and distribution of energy, data and material (oil and derivatives, gas, water)." See https://www.tesmec.com/about-us. Tesmec further markets its "product portfolio" as including "railway equipment."

13.  Amtrak provides intercity passenger rail services and is the owner of approximately 80% of the Northeast Corridor ("NEC"), a rail system on which Amtrak operates its passenger trains from Washington D.C. to Boston, MA. Amtrak performs maintenance of its tracks and other facilities on the NEC.

B.  **The Tesmec-Amtrak Sale Contract**

14.  On August 31, 2012, Tesmec and Amtrak entered into a "National Railroad Passenger Corp (Amtrak) Supplies Contract", under which Amtrak purchased a Production Wire Train from Tesmec for $7,191,664 ("the Sales Contract").

15.  The Production Wire Train was designed and manufactured by Tesmec.

16.  The Production Wire Train consisted of the Work Car and a Production Wire Car ("the Wire Car").

17.  Amtrak purchased the Production Wire Train to support its New Jersey High-Speed Rail Improvement Program ("NJHSRIP"), the objectives of which included the upgrade and improvement of the catenary, power, track, and signal systems on the NEC, primarily between New Brunswick, NJ and Trenton, NJ.

18.  The Sales Contract included a number of Contract Documents, each of which were

incorporated in the Sales Contract. The Contract Documents included, *inter alia*, Amtrak's "General Provisions for Supplies Contracts Funded by the United States through the American Recovery And Reinvestment Act Of 2009 (New York City To Trenton, NJ High-Speed Rail Improvements)" (the "General Provisions").

19. In the General Provisions incorporated into the Sales Contract, Tesmec expressly warranted that the Work Car and Wire Car were:

    a. new;

    b. were of merchantable and of good quality, free from defects in design, material and workmanship;

    c. were suitable for their intended purpose; and

    d. conformed with all requirements of the Contract Documents;

20. In the General Provisions incorporated into the Sales Contract, Tesmec also:

    a. represented and warranted that the Work Car and Wire Car were guaranteed against defects for a period of two years from the date of final acceptance by Amtrak; and

    b. agreed that, upon discovery of any defects, Tesmec would repair or replace the defective product within seventy-two hours after notice from Amtrak.

21. Under the General Provisions incorporated into the Sales Contract, instead of requiring the correction or replacement of the defects in the Work Car or Wire Car, Amtrak was permitted to reduce the contract price by an "equitable amount."

22. Under the General Provisions incorporated into the Sales Contract, Tesmec agreed that the Sales Contract was governed by the laws of the District of Columbia and that any disputes arising under it would be litigated in the United States District Court for the District of Columbia.

Tesmec expressly agreed that this Court had jurisdiction over Tesmec.

23. Under the General Conditions incorporated into the Sales Contract, Tesmec agreed to indemnity and hold Amtrak harmless from and against any claims, losses and liability resulting from, *inter alia*, Tesmec's breach of warranty and damage to property (including the loss of use of property) arising from or directly or indirectly caused by or resulting from "supplies, material, deliverables, products or equipment supplied by, or from activities of, or work performed by [Tesmec] under the Contract, or as a result of [Tesmec]'s failure to perform its obligations in compliance with the Contract Documents."

C. **Problems with the Work Car and Wire Car Before the Fire**

24. In or about December 2014, both the Work Car and Wire Car failed pre-delivery and acceptance inspection.

25. Among other things, during inspection, the Work Car experienced excessive heat generated by its turbocharger. As a result of this issue, Tesmec implemented certain modifications to the Work Car, including the installation of a heat shield between the turbocharger and the floor panels.

26. Amtrak accepted the Work Car and Wire Car on June 7, 2016.

27. After Amtrak accepted the Work Car and Wire Car, it experienced repeated problems with the vehicles. For example:

    a. From July 2016 through August 2017, there were multiple air compressor failures on the Wire Car and Work Car, which caused the brakes to engage and then not release. This resulted in delays of 1-2 hours per occurrence;

    b. On or about October 24, 2016, the mast arm of the Wire Car failed, causing the Wire Car to be out of service for approximately nine (9) days;

    c. On or about January 14, 2017, the Wire Car experienced a fire and sustained

6

significant damage due to the failure of its engine. As a result, the Wire Car was out of service from approximately January 14, 2017 through May 30, 2017;

d.  Between approximately June 2017 and December 2017, the bull wheels of the Wire Car failed to properly apply wire tension, greatly impeding progress in stringing catenaries;

e.  On or about June 29, 2017, the platform lift mechanism on the Work Car failed, resulting in approximately two-and-a-half weeks of lost productivity; and

f.  Amtrak also experienced frequent intermittent electrical system problems in the Work Car.

28.  The foregoing issues arise from and were caused by acts and omissions of Tesmec, including defects in the design and manufacture of the Wire Car and Work Car.

29.  Each of the foregoing resulted in significant losses in productivity and delay in connection with the NJHSRIP and caused Amtrak to sustain monetary losses.

30.  In all, Amtrak estimates that it incurred $559,807.65 in damages. Such damages were caused directly by, *inter alia*, Tesmec breaches of contract and breach of warranty. In connection with these breaches, Tesmec was obligated to indemnify and hold harmless Amtrak under the Sales Contract and the General Provisions incorporated therein.

31.  Despite notice and demand from Amtrak that Tesmec indemnify and reimburse Amtrak's losses and damages, Tesmec refused to do so. Instead, Tesmec invoiced Amtrak $300,218.84 for parts, labor and travel expenses to address the foregoing issues.

D.  **August 1, 2018 Settlement Agreement**

32.  Pursuant to several discussions between the Parties concerning the foregoing issues related to the Work Car and Wire Car, the Parties entered into a "Settlement Agreement and

Release" on August 1, 2018 ("the Settlement Agreement").

33. In § 1 of the Settlement Agreement entitled "Extended Warranty," Tesmec expressly agreed to provide an "extended bumper-to-bumper warranty" on the Work Car and Wire Car "with no exclusions" for a period of one-year commencing on August 1, 2018.

34. In § 1 of the Settlement Agreement, Tesmec also agreed to provide a "parts-only warranty" on the Work Car and Wire Car for one-year commencing on August 1, 2019, which "covers replacement parts that break or fail due to a manufacturing defect."

35. In § 2 of the Settlement Agreement entitled "Inspection Services", during the extended warranty period, Tesmec agreed to provide "five (5) condition checks each year at no cost . . . ."

36. In § 3 of the Settlement Agreement entitled "Training", during the extended warranty period, Amtrak agreed to purchase from Tesmec four (4) weeks of training per year, consisting of two (2) training sessions on the maintenance of the Work Car and Wire Car and two (2) sessions on the operation of the Wire Car and Work Car.

37. In § 6 of the Settlement Agreement, the Parties agreed to release each other for all claims and losses arising from and related to "Wire Train Disputes" occurring "up until the time of the execution of the Settlement Agreement."

38. The Settlement Agreement is governed by the law of the District of Columbia and any action to enforce its terms was required to be filed in the United States District Court for the District of Columbia. (§ 13).

E. <u>The July 1, 2019 Fire</u>

39. At approximately 2:55 p.m. on July 1, 2019, while operating the Work Car and Wire Car on the NEC, Amtrak employees reported smoke and fire coming from the Work Car's engine compartment.

8

40. The crew detached the Wire Car from the Work Car and unsuccessfully attempted to extinguish the fire in the Work Car.

41. The Hamilton Township Fire Department ("HTFD") responded to the fire.

42. The HTFD identified the cause of the fire as "undetermined" and "unintentional," and reported no human factors (such as crew inattentiveness or error) as causes.

43. The HTFD also reported that the fire started in the area of the motor and generator of the Work Car.

44. As a result of the fire, the Work Car was a total loss.

45. Amtrak notified Tesmec of the fire immediately after it occurred.

46. Amtrak retained Hatch LTK ("Hatch") to perform an analysis to determine the cause of the fire.

47. In sum, Hatch concluded that the cause of the fire was heat retention near the Work Car's main engine turbocharger caused by the heat shield Tesmec had installed above the turbocharger to isolate it from the floor panel.

48. Amtrak notified Tesmec of Hatch's findings.

49. Amtrak requested that Tesmec replace the Work Car with a like vehicle that would permit Amtrak to continue to use the Wire Car under Tesmec's "extended bumper-to-bumper warranty" of the Work Car in effect on the date of the fire.

50. Amtrak also demanded that Tesmec reimburse it for its costs directly caused by the fire and the destruction of the Work Car, in the amount of approximately $174,058.26.

## COUNT ONE

## BREACH OF CONTRACT AND BREACH OF WARRANTY

51. The Settlement Agreement constitutes a binding and enforceable contract between Tesmec and Amtrak.

52. Tesmec's "extended bumper-to-bumper" warranty ("the Extended Warranty") on the Work Car was in full force and effect on the date of the Fire.

53. The Extended Warranty was expressly made subject to "no exclusions."

54. The Extended Warranty included an extension of the warranties to which Tesmec agreed in the Sales Contract, including, but not limited to, Tesmec's warranties that the Work Car was: of merchantable and of good quality, free from defects in design, material and workmanship; was suitable for their intended purpose and conformed with all requirements of the Contract Documents.

55. The Extended Warranty also included a warranty by Tesmec that the Work Car was fit for the particular purposes for which Amtrak purchased the Work Car from Tesmec.

56. The Extended Warranty also included an extension of Tesmec's obligation under the Sales Agreement to repair or replace the defective product within seventy-two hours after notice from Amtrak.

57. Tesmec was aware of, or should have been aware of, the purposes for which Amtrak intended to use the Wire Car and Work Car, including in connection with Amtrak's work on the NJHSRIP.

58. Tesmec breached the Extended Warranty because, before and on the date of the fire:

    a. The Work Car was defectively designed and/or manufactured;

    b. The Work Car was not merchantable, fit or safe for its intended use and operation by Amtrak;

    c. The Work Car was not fit for the particular purposes for which Amtrak purchased the Work Car; and

  d. The Work Car did not conform to the requirements of the Contract Documents.

59. Tesmec's breaches of the Extended Warranty rendered the Work Car unsafe and unreasonably dangerous for its intended uses by Amtrak because, *inter alia*, the heat shield installed above the turbocharger in the Work Car resulted in the excessive and dangerous retention of heat which could serve as an ignition source for a fire.

60. Tesmec's breach of the subject warranties is the direct and proximate cause of the July 1, 2019 fire which resulted in the total loss of the Work Car.

61. Pursuant to the Settlement Agreement, Tesmec also had duties to:

  a. Conduct inspections of the Work Car; and

  b. Conduct training of Amtrak personnel concerning the maintenance and operation of the Work Car.

62. Tesmec breached the Settlement Agreement by failing to conduct inspections of the Work Car.

63. To the extent Tesmec conducted any such inspections, Tesmec failed to identify, notify or warn Amtrak of any defects or dangers which could reasonably be expected to result in a fire in the Work Car, including but not limited to, any defects or dangers related to or arising from the installation of the heat shield over the turbocharger in the Work Car.

64. Tesmec's breach of its obligation under the Settlement Agreement with respect to inspections caused the fire.

65. Tesmec breached the Settlement Agreement by failing to conduct, or to properly and adequately conduct, training of Amtrak personal with respect to the maintenance, use and operation of the Work Car.

66. To the extent Tesmec conducted any such training, Tesmec failed to identify, notify or warn Amtrak of any defects or dangers which could reasonably be expected to result in a fire in the Work Car, including but not limited to, any defects or dangers related to or arising from the installation of the heat shield over the turbocharger in the Work Car.

67. Tesmec's breach of its obligation under the Settlement Agreement with respect to training caused the fire.

68. As a result of Tesmec's foregoing breaches of warranty and breaches of contract, Amtrak has sustained monetary damages, including damages resulting from the loss of use of the Work Car.

69. Amtrak is also entitled to specific performance of Tesmec's obligation under the Settlement Agreement to repair or replace the Work Car, as previously demanded by Amtrak

70. Amtrak has rendered full and complete performance of its contractual obligations and duties under the Settlement Agreement and is in full compliance with the terms of the Settlement Agreement.

71. To the extent the Settlement Agreement may be interpreted to include any conditions precedent to Tesmec's obligations under the Settlement Agreement, Amtrak has fully performed such conditions.

## COUNT TWO
## STRICT PRODUCTS LIABILITY

72. Amtrak repeats and realleges the allegations contained in paragraphs 1-71 as if incorporated in full herein.

73. At all relevant times, Tesmec was engaged in the business of selling, *inter alia*, railway equipment, such as the Work Car.

74. Tesmec was also the designer and manufacturer of the Work Car.

75. When Tesmec placed the Work Car in the stream of commerce and sold and delivered it to Amtrak, the Work Car was in a defective and unreasonably dangerous condition because, *inter alia*, the heat shield installed above the turbocharger in the Work Car directly resulted in excessive and dangerous retention of heat which could serve as an ignition source for fire.

76. The Work Car, when delivered to Amtrak and on the date of the fire, was in the same condition (without any substantial change) as when Tesmec designed, manufactured and sold it.

77. At the time of the fire, Amtrak was engaged in a use of the Work Car which was intended and foreseeable and was the purpose for which Amtrak had purchased the Work Car from Tesmec.

78. The defective and unreasonably dangerous condition of the Work Car was the direct and proximate cause of the fire and Amtrak's resulting losses and damages.

79. Tesmec sold and delivered the Work Car to Amtrak without any warnings concerning potential fire dangers existing during the operation of the Work Car, including any dangers presented by Tesmec's design and manufacture of the Work Car with a heat shield over the Work Car's turbocharger.

80. The foregoing defects in the design and manufacture of the Work Car, and/or Tesmec's accompanying and continuing failures to warn Amtrak, were the direct and proximate cause of the fire and Amtrak resulting damages and losses.

81. Alternative designs of the Work Car were available to Tesmec which would have mitigated and eliminated the dangers created by Tesmec's defective design and manufacture.

82. The magnitude of the danger created by Tesmec's design and manufacture of the

Work Car (which danger incudes damage to and loss of the Work Car itself, damage to and loss of property of others and injury to persons) greatly outweighs any cost to Tesmec in implementing such safer, alternative designs.

## COUNT THREE
## NEGLIGENCE

83. Amtrak repeats and realleges the allegations contained in paragraphs 1-82 as if incorporated in full herein.

84. Tesmec owed a duty to Amtrak to supply the Work Car in a condition which allowed Amtrak to safely use and operate the Work Car.

85. Tesmec breached that duty because the Work Car was not safe, but rather was in an unreasonably unsafe condition.

86. Tesmec was also negligent in conducting, or failing to adequately conduct, inspections of the Work Car and training of Amtrak personnel in the use, operation and maintenance of the Work Car.

87. Tesmec's negligence was the direct and proximate cause of the fire and Amtrak's resulting losses and damages

## PRAYER FOR RELIEF

**WHEREFORE**, Amtrak respectfully requests that judgment be entered against Tesmec:

1. for compensatory damages in an amount to be determined at trial, but in excess of $75,000;

2. for specific performance;

3. for punitive damages in an amount to be determined at trial;

4. for pre and post judgment interest;

5. for reasonable attorneys' fees and costs incurred in prosecuting this action; and

6. for such other and further relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Amtrak respectfully demands a trial by jury on all claims and issues so triable.

**LANDMAN CORSI BALLAINE & FORD P.C.**
**Attorneys for National Railroad Passenger Corp.**

Dated: June 30, 2022

*/s/ Jerry A. Cuomo*
Jerry A. Cuomo (D.C. Bar No. NY0168)
Mark S. Landman (D.C. Bar No. 286476)